La Jueza Asociada Señora Fiol Matta
emitió la opinión del Tribunal.
El caso de autos nos presenta la ocasión para expresar-nos acerca de la interacción entre la Junta de Planificación *952 y los municipios autónomos en el proceso de recalificación indirecta del suelo municipal. Examinaremos también la aplicación de un Plan de Ordenación Territorial y el pro-ceso para su revisión.
I
El 23 de mayo de 2003 Unlimited Storage, Corp. (Unlimited) presentó, por conducto del Ing. Camilo Almeyda Eu-rite, una solicitud de enmienda a la consulta de ubicación Núm. 2001-16-0173-JPU, sobre un proyecto comercial ubi-cado en una finca con cabida de 4.27 cuerdas en el Barrio Frailes del Municipio Autónomo de Guaynabo (Muni-cipio).(1) Luego de que Unlimited entregara la documenta-ción pertinente y se publicara la notificación por edicto de vistas públicas, la Junta de Planificación (Junta) celebró una vista. A ésta no acudieron vecinos ni comparecieron las agencias públicas. Sin embargo, el Municipio asistió, repre-sentado por el Sr. Luis Martínez, a través de la Oficina de Permisos Urbanísticos del Gobierno Municipal.(2)
La enmienda a la consulta de ubicación solicitada pro-puso eliminar la estructura originalmente autorizada para oficinas y sustituirla por tres edificios dedicados a un ne-gocio de mini-almacenes. Como resultado de estas modifi-caciones, el área total de ocupación disminuiría de 250,000 pies cuadrados a 100,766 pies cuadrados, lo cual conlleva-ría una reducción considerable en el impacto del proyecto a su entorno inmediato. Además, Unlimited solicitó a la Junta la recalificación del predio, hasta entonces com-puesto por un Distrito Residencial Tres (R-3) y un Distrito *953 Comercial Tres (C-3),(3) a un Distrito Industrial Liviano (I-l).(4) Esta petición, según la parte proponente, se debió a la necesidad de que los parámetros de diseño del proyecto fueran conformes al de dicho distrito industrial. Unlimited argumentó que el proyecto de mini-almacenes operaría como un negocio comercial de alquiler al detal de espacio y que, por lo tanto, sería de extrema conveniencia para la comunidad residencial y comercial del área, la cual de-muestra un uso y comportamiento mixto.(5)
Durante el procedimiento de evaluación, las diversas agencias públicas consultadas avalaron la enmienda a la consulta de ubicación del proyecto sometido por Unlimited. A su vez, el Municipio endosó el proyecto de mini-almace-nes e informó, por conducto del Vicealcalde, licenciado *954 Efraín Pérez Jiménez, que el desarrollo propuesto por Unlimited era compatible con la política pública municipal para el suelo urbano, según establecida en su Plan de Or-denación Territorial.(6)
Mediante una resolución emitida el 6 de octubre de 2004, notificada el 5 de noviembre de 2004, la Junta auto-rizó la enmienda a la consulta de ubicación y ordenó que el proyecto propuesto tuviese parámetros de diseño conforme a un Distrito 1-1. Entre sus múltiples consideraciones, la agencia consideró el Reglamento de Calificación del Muni-cipio, así como el comportamiento y la actividad del área circundante al proyecto, la naturaleza del negocio pro-puesto y el cumplimiento con los criterios para desarrollos extensos, entre otros.(7) La Junta reconoció la viabilidad del proyecto, junto a las expresiones del Ejecutivo municipal en cuanto a la conformidad del proyecto con el Plan de Ordenación del Municipio. Resulta importante destacar que ninguna de las personas interesadas que fueron noti-ficadas de la vista pública y de la Resolución de la Junta, incluyendo el Municipio, solicitó reconsideración ni acudió en recurso de revisión ante los foros judiciales, por lo cual la resolución de la Junta advino final y firme.
En conformidad con lo dispuesto por la Junta, el 19 de octubre de 2005, dentro del término dispuesto para ello, Unlimited solicitó a la Oficina de Permisos Urbanísticos del Gobierno Municipal Autónomo de Guaynabo la autori-zación de anteproyecto para la construcción del negocio de *955 mini-almacenes. Posteriormente, considerando que este procedimiento se había extendido más de lo usual, Unlimited sostuvo una serie de reuniones con el Alcalde y su grupo de trabajo, además de cursar varias misivas con el fin de agilizar los trámites.(8) A pesar de ello, y en vista de que la Oficina de Permisos aún no había actuado sobre su solicitud, Unlimited presentó, el 30 de marzo de 2007, un recurso extraordinario de mandamus, solicitando al Tribunal de Primera Instancia que ordenara al ente municipal atender y resolver la autorización de anteproyecto presentada. Mediante Resolución y Orden dictada el 11 de abril de 2007, notificada el 18 de abril de 2007, el Tribunal de Primera Instancia concedió al Municipio un término de 20 días para notificar si procedía o no la solicitud de la parte proponente.(9)
Finalmente, el 1 de mayo de 2007 el Municipio denegó la solicitud de autorización de anteproyecto. El Municipio concluyó que el desarrollo del proyecto de mini-almacenes con parámetros de diseño industrial no era viable, entre otras razones, por el uso residencial y comercial existente en el área. Según se desprende de la resolución, la decisión del ente local se debió, principalmente, a los cambios en la política pública, producto de la revisión en curso de su Plan de Ordenación Territorial, que una vez concluidos conver-tirían el área donde se había de ubicar el proyecto en es-trictamente residencial. Inconforme, Unlimited recurrió ante el Tribunal de Apelaciones, mediante recurso de revi-sión, y argüyó que las actuaciones del Municipio consti-tuían un ataque colateral tardío e indebido a la consulta de ubicación aprobada por la Junta.
El 10 de septiembre de 2007 el foro apelativo revocó la decisión del Municipio. Este dictamen se fundamentó en *956 que las facultades conferidas por el Convenio de Transfe-rencia de Competencias habían concedido al Municipio el poder de determinar si el anteproyecto cumplía con las le-yes y reglamentos aplicables, pero no la potestad de dene-gar el anteproyecto porque el desarrollo tal como fue apro-bado por la Junta proyectaba un cambio de calificación del solar.
Inconforme, el Municipio solicitó reconsideración y ar-gumentó que el proceso de recalificación no podía llevarse a cabo ante la agencia central, ya que el mismo se rige por el Artículo 13.008 de la Ley de Municipios Autónomos.(10) El foro apelativo denegó la solicitud de reconsideración, luego de lo cual el Municipio recurrió ante este Tribunal mediante petición de certiorari señalando los errores si-guientes:
1. Erró el Tribunal de Apelaciones al determinar que la recalificación del suelo dentro de la demarcación geográfica del Municipio fue atendida por la Junta de Planificación cuando autorizó la consulta de ubicación y, por lo tanto, es un asunto final sobre el cual el Municipio no tiene jurisdicción.
2. Erró el Tribunal de Apelaciones al permitir que el proceso cuasiadjudicativo de la consulta de ubicación esté por encima de los postulados del Artículo 13.008 de la Ley de Municipios Autónomos en cuanto al proceso de recalificación.
3. Erró el Tribunal de Apelaciones al provocar la legali-dad de una recalificación indirecta del suelo municipal por parte de la Junta de Planificación cuando la Ley de Muni-cipios Autónomos nada dispone al respecto.
4. Erró el Tribunal de Apelaciones al obviar que la Ley de Municipios Autónomos nada dispone sobre la facultad retenida por la Junta de Planificación para recalificar el suelo municipal.
*957 5. Erró el Tribunal de Apelaciones al no reconocerle al Municipio la facultad de aplicar los Objetivos y Políticas Públicas de su Plan de Ordenación Territorial, en violación a la Ley de Municipios Autónomos y la jurisprudencia aplicable.
6. Erró el Tribunal de Apelaciones al reconocer derechos adquiridos a una entidad privada, Unlimited, sobre el de-recho del Municipio de ordenar, reordenar y revisar su Plan de Ordenación Territorial. Véase Petición de certio-rari, págs. 4-5.
El 7 de marzo de 2008 expedimos el caso de autos. Luego de presentados los alegatos de las partes, la Junta solicitó un término para expresarse sobre los señalamien-tos de error del Municipio, a lo cual accedimos mediante Resolución de 25 de junio de 2008. Contando con la compa-recencia de la Junta, y los alegatos de las partes, procede-mos a resolver.
II
La Ley Núm. 75 de 24 de junio de 1975, mejor conocida como Ley Orgánica de la Junta de Planificación de Puerto Rico, encargó a la Junta la misión de servir como el organismo estatal encargado de guiar el desarrollo integral de Puerto Rico, tomando en consideración las actuales y futuras necesidades sociales y nuestros recursos humanos, ambientales, físicos y económicos.(11) Dentro del marco del poder de ordenar coherentemente el uso de las tierras, la Junta debe centrarse en fomentar la salud, la seguridad, el orden, la convivencia y la prosperidad del país.(12)
Para hacer realidad esta encomienda de planificación integral, la Asamblea Legislativa otorgó a la Junta *958 el poder de zonificar las distintas áreas de nuestra isla. La zonificación es el instrumento que utiliza la Junta para clasificar los terrenos en zonas o distritos, con el fin de aplicar normas generales sobre su uso y definir las carac-terísticas de las obras y edificaciones permitidas.(13) El acto de adoptar o enmendar la zonificación de un distrito es un ejercicio del poder de reglamentación delegado en la Junta.(14) Dicha facultad le' confiere a esta agencia central una gran discreción en el desarrollo y en la ejecución de la política pública sobre zonificación.(15) Los reglamentos y mapas de zonificación aprobados con ese fin pretenden pro-mover el uso más eficaz del limitado recurso de la tierra, de forma que se promueva el desarrollo urbano de manera ordenada y lógica. Esto, a su vez, requiere sopesar las diversas necesidades de la población puertorriqueña.(16) Como consecuencia de su facultad de guiar el desarrollo físico, económico y social del país, la Junta tiene poderes amplios, como el de prohibir determinados usos y tomar medidas provisionales y preventivas para lograr el uso óp-timo, tanto social como ambiental, de los terrenos del país.(17)
Existen dos vías procesales para que el propo- *959 nente de un proyecto someta ante la consideración de la Junta una solicitud de rezonificación de un predio. En primer lugar, puede promoverse dicho cambio directamente mediante una solicitud de rezonificación directa.(18) Tam-bién puede solicitarse este cambio de forma indirecta, me-diante la presentación de una consulta de ubicación cuya aprobación conllevaría alterar la zonificación de un predio.(19) No obstante, hemos expresado en reiteradas oca-siones que, debido a nuestra realidad social y territorial, el Estado está obligado, en lo posible, a mantener las zonifi-caciones existentes.(20)
El Reglamento de Zonificación de Puerto Rico Núm. 6211, Reglamento de Planificación Núm. 4, de 5 de noviem-bre de 2000, en vigor al momento de concretarse y atenderse el procedimiento de consulta de ubicación en este caso, re-quiere que se cumplan ciertos requisitos.(21) Entre estos se encuentran la notificación adecuada a los dueños de las pro-piedades colindantes y la presentación del plano de cons-trucción que muestre una representación gráfica del *960 proyecto.(22) Al considerar y resolver una consulta de ubica-ción, la Junta ejerce una función de naturaleza cuasiadjudi-cativa, por lo cual deberá resolver a base de la totalidad del expediente, mediante una resolución que incluya las deter-minaciones de hechos y las conclusiones de derecho perti-nentes, junto a los endosos emitidos. La Junta deberá con-siderar, además, los documentos pertinentes de política pública sobre la planificación como lo son, entre otros, el Plan de Desarrollo Integral, los Objetivos y Políticas Públi-cas del Plan de Usos de Terrenos de Puerto Rico y los Planes de Ordenación Territorial municipales, adoptados por la Junta y aprobados por el Gobernador.(23)
En 1975 la Asamblea Legislativa relevó a la Junta de sus responsabilidades fiscalizadoras y operacionales para permitirle dedicar sus esfuerzos y recursos a las determinaciones de política pública y las estrategias de desarrollo físico, económico y social del país.(24) A esos fines, la Ley Núm. 76 de 24 de junio de 1975, mejor conocida como Ley Orgánica de la Administración de Reglamentos y Permisos (A.R.Pe.), creó esta agencia central para ejercer como brazo operativo de planificación.(25) En particular, el Artículo 5(p) de su ley orgánica impuso a A.R.Pe. el deber de entender en la fase operacional del proceso de permisos, es decir, su misión principal es
*961 [a]plicar y velar el cumplimiento de sus propios reglamen-tos, de los Reglamentos de Planificación que haya adoptado o adopte la Junta de Planificación de Puerto Rico para el desa-rrollo, subdivisión y uso de terrenos y para la construcción y uso de edificios, así como el cumplimiento de toda ley estatal, ordenanza, o reglamentación de cualquier organismo guberna-mental que regule la construcción en Puerto Rico.(26)
En esencia, la fase operacional de planificación es posterior a la aprobación del proyecto por la Junta. Se inicia con la presentación de una solicitud de desarrollo y con-lleva revisar la viabilidad del proyecto en su fase de implantación. Esta etapa es de índole especialmente téc-nica; requiere estudiar los pormenores del proyecto, con-forme los requisitos de zonificación del distrito, y las com-plejidades físico-espaciales y sociales que genere un uso específico de terreno, así como la conformidad de las es-tructuras a erigirse con las normas y los requisitos de cons-trucción, entre otros asuntos. En el contexto de una con-sulta de ubicación, la fase operacional persigue corroborar que los detalles particulares del proyecto se adhieran a lo dispuesto en la resolución de la Junta.(27)
La Ley Núm. 81-1991, mejor conocida como Ley de Mu-nicipios Autónomos del Estado Libre Asociado de Puerto Rico,(28) cristalizó una reforma municipal que permitió la dele-gación a los gobiernos locales de una amplia gama de poderes y competencias de diversas agencias de la adminis-tración central, entre éstas la Junta y A.R.Pe. Esta reforma fue dirigida específicamente a fomentar la autonomía ges-tora del ente gubernamental local para que éste pudiese velar por el bien común de sus habitantes, prestando así aten-ción de forma directa a sus asuntos, problemas y necesi- *962 dades colectivas de forma más eficaz.(29) Esta política pú-blica estatal de descentralización gubernamental, que ha es-tado en vigor por dos décadas, enfatiza la importancia de la planificación local como un apoyo a la autonomía del muni-cipio, el cual ha sido, tradicionalmente, el lugar preferente de las prácticas democráticas.(30)
Así, la Ley de Municipios Autónomos, entre otras cosas, permite a los municipios asumir, mediante delegación, algunas de las facultades tradicionales de la Junta y A.R.Pe.(31) Estas facultades se clasifican por “Jerarquías”, de la I a la V, de acuerdo con su grado de complejidad y la capacidad municipal para asumirlas. Entre las facultades y poderes transferidos, la Junta, en su capacidad de agencia estatal supervisora y coordinadora de la ordenación territorial, delega a los municipios autónomos el poder de “[e]stablecer política, estrategias y planes dirigidos a la ordenación de su territorio, la conservación de sus recursos y su óptimo desarrollo”.(32) La Ley de Municipios Autónomos también reconoce que una vez transferida una facultad, “el municipio asumirá toda responsabilidad de las acciones tomadas en el ejercicio de esa facultad”.(33)
*963 La Asamblea Legislativa confirió a los municipios autónomos la potestad de ordenar su territorio municipal mediante la adopción de un Plan de Ordenación Territorial.(34) Este es el instrumento de ordenación integral y estratégico del territorio municipal,(35) que enuncia y dispone la política pública sobre su desarrollo y sobre el uso de sus suelos.(36) De esta forma, un municipio autónomo puede recibir, mediante delegación, el poder de calificar y recalificar sus suelos; es decir, la facultad de “clasificar y designar terrenos en distritos y la aplicación en cada distrito de normas sobre el uso de los suelos y sobre las obras y estructuras a permitirse”.(37) Cabe resaltar que el poder de calificación de un municipio autónomo es equivalente al poder de zonificación de la Junta.(38)
El desarrollo de un Plan de Ordenación Territorial requiere el estudio y la recopilación de un complejo entramado de documentos, cuyo contenido revela un minucioso análisis de la realidad socio-espacial del municipio. El Artículo 13.011 de la Ley de Municipios Autónomos dispone que en la elaboración del Plan de Ordenación Territorial, un municipio autónomo deberá identificar los reglamentos, si alguno, de la Junta o de A.R.Pe. que deben revisarse y ajustarse a su entorno territorial. Sin embargo, el municipio autónomo que pretenda enmendar o sustituir algún re- *964 glamento adoptado por las agendas centrales deberá dis-cutir y fundamentar dicha decisión.(39)
Dentro de este marco de cooperación, los municipios au-tónomos se sirven de su propio Plan de Ordenación Territorial para reglamentar el uso de los terrenos en sus lími-tes geográficos.(40) La ordenación integral y estratégica de la totalidad del territorio municipal debe estar en confor-midad con todas las políticas públicas, leyes, reglamentos y otros documentos del gobierno central relacionados con la ordenación territorial.(41) Este Plan de Ordenación Territorial, junto a los planos de clasificación y ordenación del suelo, son instrumentos complementarios al Plan de Usos de Terrenos de Puerto Rico, hasta donde éste haya sido aprobado por la Junta.(42)
Por otro lado, la Ley de Municipios Autónomos reconoce, en su Artículo 13.012, que la facultad cuya transferencia sea autorizada mediante el convenio se ejercerá de acuerdo no solamente a las normas y procedimientos establecidos en la legislación, reglamentación y política pública aplica-ble a la facultad transferida,(43) sino conforme a la Ley *965 Núm. 170 de 12 de agosto de 1988, mejor conocida como la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (L.P.A.U.).(44) Esta ley define el ámbito de la facultad revisora de los tribunales sobre las determinaciones cuasiadjudicativas de las agencias públicas. De esta forma, reconoce que es responsabilidad de los foros judiciales asegurarse de que el ente adminis-trativo actúe dentro del marco de los poderes que le han sido delegados, y en conformidad con la política pública que lo dirige.(45) La revisión judicial garantiza a los ciuda-danos y a las partes interesadas un foro al cual recurrir para vindicar sus derechos y reclamar un remedio frente a posibles actuaciones arbitrarias de las agencias públicas en un dictamen administrativo.(46)
III

A. Facultad de la Junta de Planificación y del Municipio Autónomo para recalificar el suelo Municipal mediante Consulta de Ubicación

El Municipio presenta la controversia del caso de autos como un conflicto insalvable entre sus poderes cuasilegisla-tivos de elaborar y revisar su Plan de Ordenación Territorial y el poder cuasiadjudicativo de la Junta de aprobar una con-sulta de ubicación en el territorio municipal. Alega que el poder de recalificar directamente sus terrenos le fue confe-rido expresamente mediante el Convenio de Transferencia de Competencias y que la Junta no se reservó el poder de recalificar indirectamente los terrenos municipales. Por lo *966 tanto, el Municipio entiende que la intervención de la Junta violentó el postulado mayor de la reforma municipal, es de-cir, la autonomía del municipio en los asuntos de su planificación. Como alternativa arguye, además, que la in-tervención de la Junta en el proceso de recalificar el suelo en su demarcación se podía dar únicamente a través del meca-nismo establecido en el Artículo 13.008 de la Ley de Muni-cipios Autónomos, supra, para la revisión de un Plan de Or-denación Territorial municipal.
Cuando existe un conflicto sobre si se ha delegado una competencia de la Junta o A.R.Pe. a un municipio autó-nomo, junto a su posterior interacción administrativa, es preciso examinar la Ley de Municipios Autónomos, el Con-venio de Transferencia de Competencias y los reglamentos pertinentes. De esta forma podremos analizar la natura-leza de las funciones del ente local y su relación con la agencia central para encontrar, dentro del entramado de mandatos y responsabilidades, el sentido de la delegación dispuesta por la Asamblea Legislativa y lo pactado entre ambos entes gubernamentales.
El Plan de Ordenación Territorial del Municipio Autó-nomo de Guaynabo fue aprobado por la Legislatura Municipal, el 11 de diciembre de 1998.(47) La Junta lo adoptó al año siguiente, el 16 de noviembre de 1999,(48) mientras que el Gobernador de Puerto Rico lo firmó y aprobó el 15 de diciembre de 1999.(49) Conforme al Artículo 13.012 de la Ley de Municipios Autónomos, el Municipio solicitó al primer Ejecutivo la transferencia de ciertas facultades sobre la ordenación territorial y pactó con el Gobierno central, mediante el Convenio de Transferencia de Competencias de 16 de noviembre de 2000, la concesión de las facultades *967 de planificación contenidas en las Jerarquías I, II, III y IV.(50)
Este convenio estaba en vigor cuando Unlimited pre-sentó la consulta de ubicación original y también cuando presentó la solicitud de enmienda ante la Junta. Con ex-cepción de las competencias reservadas expresamente por la Junta y A.R.Pe.,(51) las Jerarquías I, II, III y IV le confi-rieron al Municipio la facultad de aprobar permisos de uso en estructuras que estuviesen conformes con los reglamen-tos de planificación, siempre que no constituyesen una va-riación o excepción. Además, le confirieron la facultad de autorizar ciertos anteproyectos, segregaciones de hasta 10 solares en suelo urbano o urbanizable y proyectos de urba-nización de hasta 50 solares, así como enmendar el Plano de Ordenación. Resaltamos que a esa fecha no se había transferido la Jerarquía V, que permite conceder al Muni-cipio “otras facultades” que no fueran expresamente reser-vadas por las agencias centrales.(52) Es claro, pues, que no se le había delegado al Municipio el poder de aprobar una consulta de ubicación.
Ciertamente, tanto el texto de la Ley de Municipios Au-tónomos, como las jerarquías transferidas en el Convenio de Transferencia de Competencias, guardan silencio sobre la delegación de la facultad de recalificar indirectamente *968 un predio municipal. Este punto es crucial a la luz del in-ciso (P) de las condiciones generales del Convenio de Transferencia de Competencias, el cual reconoce que “las facultades en la materia que no se delegan expresamente mediante este Convenio, continúan siendo facultad de la Junta de Planificación o de la Administración de Regla-mentos y Permisos[,] según corresponda”.(53) Es más, el pacto entre el ente local y las agencias centrales establece claramente que “[e]l Municipio asumirá toda la responsa-bilidad sobre las primeras cuatro (IV) Jerarquías indica-das en este Convenio al momento de entrar en vigencia el mismo”.(54) Por otro lado, la Sección (B)(1)(c) de la Parte VI, que concierne las medidas de coordinación y fiscalización entre la Junta y el Municipio, dispone que todas las con-sultas de ubicación privadas serán presentadas en el Mu-nicipio y que este someterá el expediente a la agencia central con jurisdicción, a no más tardar, 10 días después de la presentación.(55)
Como vemos, se trata de un convenio cuya finalidad es delegar de forma expresa ciertas funciones de planifica-ción, según la capacidad y eficiencia que demuestre el mu-nicipio autónomo.(56) Por eso, no podemos presumir que el silencio legislativo conceda exclusivamente el poder de re-calificación al ente municipal o que le impida a la Junta ejercerlo. En realidad, además del Convenio de Transferen-cia de Competencias, la contención del Municipio contra-dice explícitamente los propios reglamentos adoptados por éste. La Sección 2.00 del Reglamento de Calificación de Suelos del Municipio Autónomo de Guaynabo (Plan de Or- *969 denación Territorial, Vol. III),(57) lee de la forma siguiente: “[e]l Municipio o la Junta de Planificación, según corres-ponda, evaluará las consultas de ubicación tomando en consideración el nivel de autonomía, facultades transferi-das o jerarquías obtenidas a través del Convenio negociado entre las partes.” (Enfasis nuestro.)(58)
En cuanto al desenlace del procedimiento de recalifica-ción indirecta de un distrito o solar, la Sección 4.06 del Reglamento de Calificación dispone que
[ic]uando se trate de un uso previamente autorizado por el Municipio o la Junta [de Planificación], según corresponda, para el cual se hubiere celebrado vista pública, notificado la intención de cambiar el distrito de calificación y expedido el permiso de uso, la parte interesada podrá iniciar el procedi-miento de cambio en el mapa de calificación sometiendo una copia del permiso de uso certificado y autorizado por la Admi-nistración de Reglamentos y Permisos como evidencia de que el mismo se construyó y se autorizó su uso conforme a las dis-posiciones de la consulta [de ubicación]. Cuando se verifique que la consulta [de ubicación] se culminó, el Municipio o la Junta [de Planificación], según corresponda, podrá enmendar el mapa sin necesidad de nueva vista. (Enfasis nuestro.)(59)
Es decir, el Reglamento de Calificación de Suelos adop-tado por el ente municipal dispone para que tanto el Mu-nicipio como la Junta puedan recalificar indirectamente un *970 distrito o solar dentro de los límites territoriales de un mu-nicipio autónomo, conforme a lo pactado con el Gobierno central. En el caso de autos, el Municipio simplemente no había adquirido dicha facultad al momento de someterse la enmienda a la consulta de ubicación. Por lo tanto, no cabe hablar de un acto ilegal por parte de la Junta.
Más aún, al renovarse el Convenio de Transferencia de Competencias, para transferir al Municipio ciertos poderes bajo la Jerarquía V, el nuevo pacto tampoco delegó al ente municipal el poder de aprobar consultas de ubicación.(60) Lo anteriormente discutido deja en entredicho el argu-mento del Municipio en torno a que la recalificación de los suelos municipales deberá llevarse a cabo, forzosamente, a petición del Municipio y a través del mecanismo de revi-sión del Plan de Ordenación Territorial dispuesto por el Artículo 13.008 de la Ley de Municipios Autónomos, supra. Recordemos que tanto el mecanismo de recalificación directa, como el de recalificación indirecta, son instrumentos de planificación que le permiten al municipio autónomo y a la Junta ser más flexibles a la hora de asegurar el uso óptimo de sus terrenos. Claramente, el poder delegado al Municipio para recalificar directamente sus suelos no es un impedimento para que la Junta ejerza la facultad rete-nida de aprobar consultas de ubicación que constituyan, a su vez, una recalificación indirecta.
Ahora bien, es menester que distingamos las diversas fa-cultades delegadas al Municipio y cómo deben emplearse. *971 Recalcamos que mediante el Convenio de Transferencia de Competencias se le delegaron, parcialmente, los poderes de planificación y de enunciación de política pública respecto a su demarcación territorial, junto a ciertas facultades relati-vas a los asuntos operacionales normalmente atendidos por A.R.Pe. En lo que a este caso concierne, al delegarse la Je-rarquía V mediante el nuevo Convenio de Transferencia de Competencias, aprobado el 14 de junio de 2005, se confirió al Municipio la facultad operacional de atender solicitudes de anteproyectos como la que sometió Unlimited.(61)
De esa forma, facultades que están nítidamente separa-das a nivel estatal mediante las leyes orgánicas de la Junta y A.R.Pe. se encuentran ahora entrelazadas en una sola agencia local. Aunque el andamiaje municipal tiende a divergir de la bifurcación de poderes de planificación a ni-vel estatal, el Municipio está obligado a ejercer dichas fa-cultades en el contexto de la solicitud presentada y con-forme a la etapa en la cual se encuentra el proyecto que está ante su consideración. Por lo tanto, el Municipio no puede sobrepasarse de las facultades extendidas mediante su Convenio de Transferencia de Competencias e invadir las prerrogativas que por mandato contractual le pertenecen únicamente a la Junta.
En Hatillo Cash & Carry v. A.R.Pe.,(62) este Tribunal dictaminó que A.R.Pe. actuó en contra de los poderes que le fueron delegados a través de su ley orgánica, al aprobar una fracción de un proyecto que había sufrido diversas y *972 sustanciales alteraciones, como si se tratara del proyecto originalmente aprobado por la Junta, cuando lo que corres-pondía era una enmienda a la consulta de ubicación original. En aquella ocasión aclaramos que el poder de rea-lizar determinaciones de política pública no era delegable a A.R.Pe., y que esa agencia, en su función de velar por el fiel cumplimiento de las leyes y reglamentos de planificación, no podía arrogarse las funciones de desarrollo estratégico que mantenía la Junta.(63)
Concretamente, el Municipio está facultado, de forma delimitada y subordinada a la coordinación con la Junta, para hacer determinaciones de política pública dentro de su demarcación territorial. No obstante, ello no significa que al intervenir en el caso de autos, podía ignorar la etapa procesal en la que se encontraba el trámite. El Municipio no podía obviar que a ese momento la Junta había ejercido debidamente la facultad, aún no delegada mediante el Convenio de Transferencia de Competencias, de recalificar indirectamente el suelo municipal al autorizar la consulta de ubicación.
Debido a que el Municipio pactó expresamente respetar las facultades no delegadas por las agencias centrales, es indudable que resultaría contrario a derecho, a nuestra ju-risprudencia y a la propia Ley de Municipios Autónomos, interpretar que el ente municipal, con funciones y faculta-des claramente prescritas, podía revocar de facto una deci-sión final y firme emitida por la Junta. Esta conclusión es reforzada por el hecho de que no estamos ante una revisión judicial de la resolución que aprobó la consulta de ubicación. El expediente es claro en que el Municipio fue notificado de la determinación emitida por la Junta y, como agencia local interesada en el cumplimiento de su propia política pública municipal, tenía el deber ministerial de *973 agotar los remedios administrativos o de presentar un re-curso de revisión judicial si estimaba que el proyecto no cumplía con dichos postulados.(64)
B. La política pública y la revisión del Plan de Ordenación Territorial
Finalmente, nos toca atender la razón medular por la cual el Municipio denegó la autorización del anteproyecto; es decir, que el acto cuasilegislativo de revisar su Plan de Ordenación Territorial le obligaba a aplicar sus nuevas po-líticas públicas sobre el uso de sus terrenos.
De forma introductoria, el Municipio arguye que su endoso al proyecto presentado por Unlimited no era determinante en la etapa de consulta de ubicación, por lo cual el alcance y significado de dicho endoso no debe sobrevalorarse. Esta aseveración la fundamenta en la natu-raleza preliminar de un endoso a nivel de consulta de ubi-cación, el cual, según alega, no le ata inexorablemente o le impide modificar su posición en etapas posteriores como lo es la etapa operacional.
El Reglamento Núm. 7630, mejor conocido como Glosario de Términos de los Reglamentos de Planificación, define el endoso como una “[Recomendación favorable de un organismo gubernamental concernido y con jurisdicción con relación a un proyecto, pudiendo ésta ser precisa o de carácter general o estar condicionada al cumplimiento de determinados requisitos, suministro de datos y otras gestiones”.(65) El Reglamento también distingue en- *974 tre el endoso preliminar y el endoso final. El endoso preli-minar es una “[r]ecomendación de carácter general que se limita a señalar las facilidades existentes, su capacidad y los puntos de conexión o de accesos o señalar medidas, pre-cauciones o forma de ejecución a observarse al realizar la obra en beneficio del interés público”; mientras que el en-doso final es aquella “[a]probación favorable de un orga-nismo gubernamental concernido, con relación a la acepta-ción de obras construidas o que pueden ser utilizadas”.(66) El endoso emitido por el Municipio, el 12 de noviembre de 2003, lee de la manera siguiente:
El desarrollo de este proyecto es compatible [con] las estipula-ciones de la Política Pública Municipal para el Suelo Urbano (SU) según el Plan de Ordenación Territorial de la siguiente manera: Prom [ueve] el desarrollo de usos no residenciales en lugares compatibles, apropiados y adyacentes. Estimu[la] el redesarrollo de lugares comerciales. Propic[ia] el redesarrollo de lugares céntricos que provean una variedad de servicios.(67)
Sale a relucir del texto citado que éste no es un endoso preliminar. Se trata de un endoso específico y categórico que constata el fiel cumplimiento del proyecto propuesto con la política pública enunciada por el Municipio en su Plan de Ordenación Territorial vigente.
El Convenio de Transferencia de Competencias del Municipio dispone que cuando la Junta retiene o se reserva una facultad, esta deberá ejercer dicho poder aplicando los reglamentos adoptados por el municipio autónomo, al igual que solicitar al ente municipal comentarios sobre la evaluación de la solicitud que tiene ante sí.(68) Dicho insumo es necesario para mantener intacto el eje cen *975 tral de la política pública de nuestro país en torno a la descentralización del poder ejecutivo: la autonomía municipal. Ahora bien, un endoso municipal no es de por sí obligatorio para la agencia pública que lo recibe. Se trata de una expresión emitida por una autoridad con competen-cia, cuyo contenido deberá ser evaluado con el debido es-crutinio ministerial y tomando en consideración la totali-dad de los intereses públicos y privados implicados. Es decir, por más concluyente que sea un endoso en el proceso de aprobar una consulta de ubicación, éste no deja de ser una recomendación, cuyos fundamentos deberán enfrentar la concurrencia o no concurrencia de la agencia autorizada por ley de evaluarlo. Por lo tanto, el endoso del Municipio en un procedimiento de consulta de ubicación ante la Junta constituye una parte esencial del cúmulo de expre-siones que las agencias públicas deben emitir y que la Junta debe evaluar con miras a cumplir con su deber de coordinar entre sí una planificación íntegra.(69)
En concordancia con lo indicado anteriormente, el Mu-nicipio ejerce en esta instancia dos funciones procesales distintas y separadas. Es evidente que un municipio autó-nomo puede endosar un proyecto que está ante la conside-ración de una agencia central en una fase que no le corres-ponde atender porque no se le ha delegado esa facultad, como sucede en el caso de autos, y luego denegar el pro-yecto en la subsiguiente etapa operacional, si encuentra un incumplimiento con las leyes y reglamentos aplicables en esa etapa o que el proyecto presentado no es conforme a los parámetros dispuestos en la resolución de la Junta.(70) *976 Ahora bien, el Municipio defiende su denegación del pro-yecto de autos al amparo de la facultad que la Junta le delegó para revisar su Plan de Ordenación Territorial. Aduce que los cambios en la política pública municipal con-ciben el distrito destinado para el proyecto de mini-alma-cenes como uno de carácter estrictamente residencial.(71) De esta forma, el Municipio concluye que tiene la obliga-ción de aplicar el Derecho de planificación conforme a sus nuevas políticas públicas, aunque no estuvieran vigentes al tiempo en que se resuelve el caso de autos.(72) Este se-ñalamiento nos permite auscultar el proceso de revisión de un Plan de Ordenación Territorial y la obligación del Mu-nicipio de aplicar el producto final de dicho proceso.
Ciertamente, el Municipio tiene la facultad y el deber de hacer valer las metas y objetivos de su propia ordenación territorial, según se deduce del Artículo 13.005 y el Artí-culo 13.012 de la Ley de Municipios Autónomos.(73) Concre-tamente, el Capítulo VI del Plan de Ordenación Territorial *977 del Municipio Autónomo de Guaynabo enuncia la política pública para su desarrollo futuro. Este título dispone los principios de planificación que afectarán cada categoría de suelo, al igual que define los aspectos básicos de la organi-zación territorial y establece el programa de desarrollo e implementación. La política pública del Municipio sobre el uso del suelo urbano busca, entre otros asuntos, propiciar el intercambio socioeconómico, maximizar el uso del suelo y conservar el patrimonio cultural, entre otros.(74)
En el proceso de creación o revisión de una política pú-blica hay dos elementos principales: el técnico y el político.(75) En el primero se atiende la recopilación y aná-lisis de datos objetivos, la designación regional de su enfo-que y la programación de acciones específicas; mientras que en el segundo se establecen los objetivos concretos, la selección entre varios modelos alternos para alcanzar las metas trazadas y la evaluación de los resultados obtenidos. Sobre este último elemento, el político, que contiene la fase de formulación e implementación de la política pública so-bre la planificación, y es el que nos concierne para adjudi-car el caso de autos, nos expresamos hoy por primera vez.
El doctor Punsoda Díaz resalta que los planes de orde-nación “son el producto natural del proceso de planifica-ción” y, como tales, “[c]onstituyen expresiones detalladas de las acciones necesarias para alcanzar los objetivos establecidos”.(76) La naturaleza de estos documentos de-nota que el proceso de su elaboración y revisión está reves-tido de un gran interés público, pues la pureza y transpa- *978 renda de estos actos administrativos, necesarios para garantizar un funcionamiento gubernamental íntegro y co-herente, atañe a nuestra población en general. A su vez, la política pública implantada por el Estado en los planes de ordenación procura dar certeza a las actuaciones adminis-trativas, anclándolos en unos principios, prioridades, me-tas y objetivos claros, que son esenciales en la justa y eficaz gestión gubernamental.(77) Además, la política pública así plasmada es determinante en la labor diaria de los foros judiciales de adjudicar casos, pues establece parámetros vinculantes que los tribunales tendrán que incorporar en su interpretación de los hechos y en la aplicación del dere-cho, cuando se ventilen las controversias en los foros pertinentes.(78)
La Ley de Municipios Autónomos define la revisión de un Plan de Ordenación Territorial como un proceso de “recopilación de nuevos datos, inventarios y necesidades; la enunciación de nuevas políticas; o la promulgación de reglamentos que sustituyan, amplíen o limiten significativamente un Plan de Ordenación vigente”. (Enfasis nuestro.)(79) Se trata, como indica el doctor Punsoda Díaz, de “documentos algo estáticos”, por eso, “es el proceso de planificación, continuo y dinámico, y no el documento que *979 contiene el plan, lo que contribuye a facilitar el desarrollo”. (Enfasis en el original y nuestro.)(80)
De entrada, reconocemos que el proceso de elaboración y revisión de la política pública es una tarea compleja. Pla-nificar es sinónimo de tomar decisiones. Es marcar priori-dades y construir una hoja de ruta en función de ellas.(81) La misión de un municipio autónomo, que adviene a las facultades y competencias de organizar el uso de sus sue-los, es planificar de forma coordinada y coherente la maxi-mización de éstos, conforme a las necesidades que impone su propia realidad social, económica y espacial. El proceso comienza con la identificación de un problema público. A este paso le sigue la consideración de soluciones, o, más bien, el momento en que el ente gubernamental propone diversos métodos y alternativas para atajar el problema público.(82) Acto seguido, se concreta la selección de un marco conceptual para favorecer una medida específica. Estas etapas preliminares se dirigen hacia la implementa-ción, donde finalmente media la asignación de recursos y la realización de los actos oficiales pertinentes para su en-trada en vigor. (83) Podemos apreciar que no se trata de un *980 proceso expedito, ya que conlleva también una constante evaluación, integral o parcial, del marco público elaborado, después de un tiempo indeterminado de funcionamiento, con el fin de realizar los ajustes necesarios que aseguren la corrección del problema social originalmente identificado. Evidentemente, la propia naturaleza dinámica del proceso puede poner en precario el plan anterior.
El Municipio alega en su petición de certiorari que eso es, precisamente, lo sucedido en este caso y que tiene la obligación de aplicar el Derecho de planificación como está concebido actualmente, o sea, hasta donde ha progresado el proceso dinámico de revisión de su política pública de ordenación territorial. Por lo tanto, alega que tiene la fa-cultad de considerar y aplicar las propuestas de revisión al Plan de Ordenación Territorial, porque éstas constituyen las medidas que el Municipio entiende necesarias para la planificación óptima del entorno local.(84) Para fundamen-tar esta aseveración, el Municipio nos remite al caso de Hernández, Alvarez v. Centro Unido.(85)
Ahora bien, el Municipio hace caso omiso del contexto fáctico en el cual este Tribunal actuó en el caso citado. Contrario al caso de autos, en Hernández, Alvarez no exis-tía un Plan de Ordenación Territorial municipal y a la luz de este vacío jurídico se debía analizar el proyecto pro-puesto conforme a la política pública enunciada en los Ob-jetivos y Políticas Públicas del Plan de Usos de Terreno de Puerto Rico. En aquella ocasión, expresamos que
*981 ... al no existir ni un plan de usos de terrenos ni un plan de ordenación territorial vigentes para el área específica en que estaría ubicado el proyecto, la Junta de Planificación no podía soslayar un documento que sí estaba en vigor, que fue adoptado por ella misma en 1995, y que fue aprobado por el entonces Gobernador de Puerto Rico, para que fuera un “documento rector de política pública” que aplicara a los usos de terrenos en todo Puerto Rico. (Énfasis en el original y nuestro.)(86)
A diferencia del caso antes citado, aquí estaba vigente un Plan de Ordenación Territorial que regía sobre la demarcación territorial del Municipio. En lo que sí son similares el caso de autos y el de Hernández, Alvarez es en la pertinencia de la norma, muchas veces repetida por este Tribunal, que una agencia administrativa no puede ejercer sus facultades a espaldas de un documento de política pública debidamente promulgado por la agencia y aprobado por el Gobernador.(87)
En el caso de autos, el Municipio no podía ignorar su propio Plan de Ordenación Territorial para aplicar los enunciados de una revisión de su política pública, cuya puesta en vigor, incluso, no ha sido demostrada.(88) Máxime, cuando la Ley de Municipios Autónomos recoge de forma expresa que “[u\na vez el Plan [de Ordenación] Territorial entre en vigor, toda decisión sobre el uso del suelo se hará en conformidad con el mismo”. (Enfasis *982 nuestro.)(89) Dicho estatuto establece claramente que en nuestra jurisdicción no basta siquiera con que un munici-pio autónomo adopte un Plan de Ordenación Territorial, ya que su posterior aprobación y puesta en vigor depende del aval de la Junta y el Gobernador de Puerto Rico. Es decir, la adopción de un Plan de Ordenación Territorial por parte del Municipio es tan sólo uno de varios pasos en camino a su vigencia.(90) Por lo tanto, y ante la falta de prueba en el expediente que nos señale que el Plan de Ordenación Territorial en vigor desde 1999 fue sustituido por otro al mo-mento de atender la autorización de anteproyecto, no po-demos refrendar las actuaciones del Municipio.
C. La aplicación temporal de un Plan de Ordenación Territorial
En cuanto al último señalamiento de error, nada en la sentencia del Tribunal de Apelaciones indica que se hayan reconocido derechos adquiridos a Unlimited mediante la aprobación de la consulta de ubicación. El caso de autos trata sobre las prerrogativas delegadas al Municipio y la revisión y aplicación de su Plan de Ordenación Territorial municipal. No obstante, son pertinentes nuestras ex-presiones en el caso Maldonado v. Junta Planificación,(91) donde resolvimos que un reglamento aprobado luego de haberse presentado una consulta de ubicación puede ser fun- *983 damento suficiente para denegar la consulta si, al mo-mento de su presentación, el proceso de aprobación de la reglamentación ya había comenzado oficialmente y se ha-bían hecho gestiones tendentes a informar al pueblo sobre el particular.(92) Sin embargo, fuimos claros en cuanto a que la doctrina adoptada en este caso no aplica cuando la consulta de ubicación haya sido concedida antes de entrar en vigor la nueva reglamentación.(93)
El Municipio debe atender, nuevamente, la autorización de anteproyecto de Unlimited en la etapa preliminar del proceso operacional, cuyo fin último es determinar si éste cumple con las leyes y reglamentos aplicables.(94) Reconoce-mos que a la fecha en que se emite este dictamen está en vigor un nuevo Plan de Ordenación Territorial. A ese efecto, tomamos conocimiento judicial de la revisión integral apro-bada por el primer ejecutivo el 2 de mayo de 2010.(95) Sin embargo, la alegada incongruencia entre lo dispuesto en este nuevo instrumento de planificación y el Plan de Orde-nación Territorial en vigor cuando se presentó la autoriza-ción de anteproyecto no es óbice para que el Municipio cum-pla con su deber ministerial original de evaluar la solicitud de Unlimited conforme al Plan entonces vigente.
Los tratadistas y la jurisprudencia norteamericana so-bre el Derecho de planificación son ilustrativos en cuanto a esto. Según el tratadista Yokley, existe la regla general que dispone que una reglamentación recién en vigor podrá ser aplicada para denegar un permiso de construcción si éste *984 fue presentado pero no concedido antes de su puesta en vigencia.(96) Esto es congruente con nuestra decisión en Maldonado v. Junta Planificación, supra. Por otro lado, Yokley señala que, como excepción, esta regla general no aplicará cuando el ente local con facultad de otorgar per-misos de construcción interpone obstáculos indebidos en el procedimiento.(97) Los obstáculos de este tipo reconocidos por la jurisprudencia norteamericana varían según la ju-risdicción pero hay acuerdo en que el ente municipal en-cargado de otorgar un permiso no puede actuar de forma tal que manipule el sistema que administra, mediante dilaciones innecesarias y peijudiciales, a la espera de que se apruebe una nueva reglamentación que sirva de base para no conceder el permiso.(98)
*985 Ahora bien, debemos resaltar que el Municipio fue re-ceptivo y diligente en cuanto a los dos endosos emitidos a favor tanto de la consulta de ubicación original como de la enmienda a la consulta de ubicación, la cual cambió el diseño y la calificación del solar donde se ubicaría el desarro-llo propuesto. El tiempo transcurrido entre dichos endosos y la aprobación de la Junta fue mínimo, al igual que la posterior presentación de la solicitud de autorización de anteproyecto ante el Municipio. Sin embargo, el expediente ilustra que durante ese proceso operacional posterior a la consulta de ubicación el Municipio actuó de forma diame-tralmente opuesta, al demorarse de forma irrazonable y sin justificación alguna, en la adjudicación de este asunto.(99)
Recalcamos que la demora de un año y medio en aten-der este asunto no fue mayor debido a la orden de mandamus emitida por el Tribunal de Primera Instancia.(100) Di *986 cho atraso es significativo, pues, como hemos explicado antes, la fase de anteproyecto sirve para “acelera[r el trá-mite de] expedición de los permisos de construcción corres-pondienteses decir, “[s]e trata propiamente de un permiso con el que se inicia un proceso que conduce expeditamente a los permisos definitivos de construcción”.(101) Llama la aten-ción el que hayan transcurrido tres años entre la denega-ción de la autorización de anteproyecto y la puesta en vi-gencia del nuevo Plan de Ordenación Territorial, cuya adopción, alegadamente, fue la razón para la denegación. Lo anterior, junto a la ausencia de un escrutinio sobrio de la Resolución de la Junta en el documento informando la decisión municipal, nos lleva a concluir que el Municipio no atendió de forma diligente la autorización de anteproyecto solicitada.(102)
*987 El Municipio aseveró en sus escritos que procedía dene-gar la autorización de anteproyecto en razón de la excesiva tardanza de Unlimited en presentar su solicitud, cuando ello claramente no es cierto.(103) A esto añadimos que nunca presentó evidencia para acreditar el inicio del proceso de revisión de su Plan de Ordenación Territorial, según dis-pone el Reglamento de Planificación Núm. 24 y el Artículo 13.008 de la Ley de Municipios Autónomos,(104) ni tan si-quiera aportó ejemplos concretos de los cambios en la polí-tica pública alegadamente en proceso.(105) Asimismo, en el alegato presentado por la Junta no se menciona siquiera que se hubiera iniciado formalmente el proceso de coordi-nación entre ambos entes gubernamentales.
La conducta ministerial del Municipio evidenciada en el expediente, sin duda, impidió que Unlimited obtuviese el permiso de construcción antes de que entrara en vigor el Plan de Ordenación Territorial de 2010. Siendo ello así, no *988 podemos avalar la denegación del permiso ni que una vez devuelto el expediente, el Municipio atienda la autoriza-ción de anteproyecto del caso de autos al amparo de las disposiciones del nuevo Plan de Ordenación Territorial.
Recordemos que, mediante la Ley de Municipios Autó-nomos, la Asamblea Legislativa redefinió la política pú-blica administrativa para dar paso a una transformación gubernamental que reestructuró las funciones del munici-pio tradicional.(106) El resultado fue redimensionar la ges-tión municipal como vínculo fundamental entre la ciudada-nía y el Gobierno Central.(107) Al igual que la reforma de 1975, la cual vio nacer a A.R.Pe. como brazo operacional de la Junta, la reforma municipal tiene como axioma asegu-rar la más estrecha coordinación entre los diversos entes administrativos a la hora de ejercer los poderes comparti-dos de planificación sobre los suelos de Puerto Rico.(108) Esta unión entre el ente central y el municipal requiere, forzosamente, la armonización de esfuerzos, para que sean *989 complementarios y compatibles y no constituyan estorbos mutuos en el desarrollo del uso óptimo de los suelos a nivel municipal, que es el fin primordial de la planificación al amparo de esta reforma administrativa.(109) De esta forma, se reafirma que la aspiración municipal de autonomía no es irrestricta ni puede funcionar dentro de un marco de actuación irrazonable o caprichosa.(110)
Resulta evidente que el Municipio queda facultado y li-mitado según determine la Asamblea Legislativa.(111) En el caso de autos el proceder del Municipio incide directa-mente en el Artículo 13.012 de la Ley de Municipios Autó-nomos, el cual dispone que “[n]ingún municipio que tenga la facultad para evaluar y expedir permisos para el tipo de obra o proyecto cuya facultad de consideración se retiene por las agencias públicas podrá negarse a aprobar la obra o proyecto, de estar dicha obra o proyecto en conformidad con lo dispuesto por las agencias públicas, ni podrá modi- *990 ficar las condiciones impuestas por éstas”.(112) Por lo tanto, refrendar los actos del Municipio constituiría, como bien declaró el foro apelativo, revalidar un ataque colateral con visos de revocar de facto una consulta de ubicación debida-mente aprobada, la cual advino final y firme.(113)
En resumen, concluimos que la competencia delegada a un municipio autónomo para recalificar directamente su suelo municipal no es impedimento para que la Junta ejerza la facultad retenida de aprobar una consulta de ubicación que constituya, a su vez, una recalificación indirecta.(114) Igualmente, un municipio autónomo no puede guiar sus determinaciones cuasiadjudicativas a base de un documento integral de planificación, como lo es el Plan de Ordenación Territorial, que no esté en vigor, conforme al procedimiento prescrito en el Artículo 13.008 de la Ley de Municipios Autónomos, supra. Tampoco tiene autoridad para revocar de facto las facultades debidamente ejercidas por la Junta.
Por todo lo antes expuesto, se confirma la sentencia del Tribunal de Apelaciones y se devuelve el caso a la Oficina de Permisos del Municipio Autónomo de Guaynabo para que se continúen los procedimientos y se determine si el proyecto propuesto cumple con la normativa aplicable con-forme la reglamentación y la política pública en vigor al momento de presentarse la autorización de anteproyecto.

Se dictará sentencia de conformidad.

Los Jueces Asociados Señor Rivera García y Señor Feli-berti Cintrón concurrieron sin opinión escrita. La Jueza *991 Asociada Señora Pabón Charneco no interviene. El Juez Presidente Señor Hernández Denton y el Juez Asociado Señor Martínez Torres se inhibieron.

 Dicha consulta fue aprobada el 24 de julio de 2002. La Junta de Planificación autorizó el proyecto original como “un proyecto comercial para la construcción de un edificio de cinco (5) plantas con un área total de 200,000 pies cuadrados que alber-garía oficinas, de las cuales 1/3 parte será de alto volumen de clientela y los restan-tes 2/3 partes serán para oficinas comunes. Se proveerá, además, 900 espacios de estacionamientos en cinco niveles, para un total de 250,000 pies cuadrados”. Resolu-ción de la Junta de Planificación de 6 de octubre de 2004, pág. 1.

 íd.

 “El proponente solicitó a la Junta [de Planificación] la recalificación del pre-dio de un Distrito Residencial Tres (R-3) y Comercial Central Tres (C-3), según con-templa el Mapa de Calificación de Suelos del Plan Territorial del Municipio Autó-nomo de Guaynabo, a un Distrito Industrial Liviano (1-1). Por consiguiente, la Junta [de Planificación] tiene ante su consideración una solicitud de cambio de calificación de un Distrito R-3 y C-3 a un Distrito 1-1”. íd., pág. 2. El Distrito R-3 es definido como “[aquel] distrito de densidad poblacional intermedia [que] se establece para clasificar áreas residenciales desarrolladas o que puedan desarrollarse y en donde se permitirán diferentes tipos de viviendas en solares de trescientos (300) metros cua-drados o más”. (Enfasis nuestro.) Sec. 9.01 del Reglamento de Calificación de los Suelos del Municipio Autónomo de Guaynabo (Plan de Ordenación Territorial, 1999, Vol. III), pág. 59. Mientras, la Sec. 16.01 del Reglamento de Calificación de los Suelos define el Distrito C-3 como “[aquel] distrito Jque] se establece para clasificar áreas comerciales existentes de carácter central(Enfasis nuestro.) Id., pág. 92.

 El Distrito 1-1, o industrial liviano, se define como “[aquel] distrito [que] se establece para clasificar áreas para el establecimiento de industrias livianas. Se persigue que los terrenos para industrias livianas se dediquen a tales fines, exclu-yendo en estos distritos el uso residencial y ciertos usos comerciales”. (Enfasis nuestro.) Id., pág. 109.

 “El proyecto contempla un uso industrial liviano de almacén no tradicional, en la medida en que ofrece el alquiler de espacios para almacenaje temporero [sic] requiere de poca mano de obra. Por ello entendemos armoniza con el comportamiento mixto del sector. Máxime cuando aparenta no tener efectos negativos sobre el ambiente y la [Junta de Calidad Ambiental] ha certificado el cumplimiento con él Artículo 4(c) de la Ley sobre Política Pública Ambiental”. (Citas omitidas y énfasis nuestro.) Re-solución de la Junta de Planificación, supra, pág. 7. Esto, a su vez, coincide con las expresiones del tratadista Yokley, quien señala que el uso trazado para el proyecto de Unlimited Storage, Inc., de mini-almacenes, puede ser considerado un uso comercial. (“Commercial uses range from retail stores, to self-storage facilities, to restaurants”.) (Énfasis nuestro.) 6 Yohley, Zoning Law and Practice, Sec. 38-1 (4ta ed.).

 Misiva de la Oficina del Alcalde del Municipio Autónomo de Guaynabo de 12 de noviembre de 2003.

 En esta instancia la Junta de Planificación evaluó, conforme a lo dispuesto en la Sección 94.00 del Reglamento de Calificación de Suelos, la conformidad del uso propuesto con el Plan de Ordenación Territorial del Municipio, la disponibilidad de la infraestructura en el sector, la forma en la cual propicia el desarrollo integral del sector y la viabilidad de dicho proyecto. Por otro lado, consideró detenidamente las implicaciones de un desarrollo extenso de diseño industrial liviano, según dispone la Sección 96.05 del Reglamento de Calificación de Suelos, supra, cumpliendo con todos los requisitos.

 Véase misivas dirigidas al Alcalde del Municipio Autónomo de Guaynabo de 7 y 15 de septiembre de 2006. Apéndice 4, págs. 79-82.

 Resolución y Orden del Tribunal de Primera Instancia de 11 de abril de 2007, Apéndice 4, pág. 236.

 21 L.P.R.A. sec. 4606.

 Art. 4 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 junio de 1975 (23 L.P.R.A. sec. 62(c)).

 íd.

 Mun. de San Juan v. Bosque Real, S.E., 158 D.P.R. 743, 761 (2003).

 23 L.P.R.A. sec. 62j(5). Véanse: Borschow Hosp. v. Jta. de Planificación, 177 D.P.R. 545, 557 (2009); T-JAC, Inc. v. Caguas Centrum. Limited, 148 D.P.R. 70, 83 (1999). Además, la Sec. 1.3 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, define un reglamento como “cualquier norma o conjunto de normas de una agencia que sea de aplicación general que ejecute o interprete la política pública o la ley”. 3 L.P.R.A. sec. 2102(7).

 Aner Investment Corp. v. J.P., 148 D.P.R. 241, 247 (1999); Asoc. Res. Park Side, Inc. v. J.P., 147 D.P.R. 277, 284 (1998); Arenas Procesadas, Inc. v. E.L.A., 132 D.P.R. 593, 608 (1993); Luán Investment Corp., v. Román, 125 D.P.R. 533, 548 (1990).

 23 L.P.R.A. sec. 62(c). Además, este Tribunal ha declarado que “[l]a planifi-cación es una disciplina integradora que busca sopesar la más diversa conjugación de factores con el fin de garantizar un desarrollo racional y balanceado del área en cuestión, y que [la misma] a su vez resulte cónsona con los desarrollos propuestos o vislumbrados para la región, áreas circundantes y el desarrollo del país”. (Enfasis suprimido.) Cambarín et al. v. A.R.P.E., 132 D.P.R. 938, 954 (1993).

 P.R. Cement Co. v. J.P., 146 D.P.R. 428, 437 (1998).

 Hernández, Álvarez v. Centro Unido, 168 D.P.R. 592, 619-620 (2006); López v. Antonio Roig Suers., Inc., 157 D.P.R. 186, 194 (2002).

 Reglamento de Zonificación de Puerto Rico Núm. 6211 (Reglamento de Pla-nificación Núm. 4) de 5 de noviembre de 2000, Sec. 4.09, pág. 50-51. La consulta de ubicación es definida como “[e]l procedimiento ante la Junta de Planificación para que evalúe, pase juicio y tome la determinación que estime pertinente sobre: (a) propuestos usos de terrenos que no son permitidos ministerialmente por la regla-mentación aplicable en áreas calificadas, pero que las disposiciones reglamentarias o legales proveen para que se consideren por la Junta de Planificación”. Glosario de Términos de los Reglamentos de Planificación, Reglamento Núm. 7630, de 11 de diciembre de 2008, Sec. 2.01(0-100), pág. 37. Véanse, además: Borschow Hosp. v. Jta. de Planificación, supra, pág. 557; T-Jac, Inc. v. Caguas Centrum Limited, supra, pág. 85; Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 117-118 (1998).

 Hernández, Álvarez v. Centro Unido, supra, pág. 617; Ortiz, Gómez et al. v. J. Plan., 152 D.P.R. 8, 17 (2000); Montoto v. Lorie, 145 D.P.R. 30, 43 (1998).

 La primera consulta de ubicación fue presentada ante la Junta de Planifi-cación en 2001 y resuelta en 2002, mientras que la enmienda a la consulta de ubi-cación fue resuelta mediante Resolución en 2004. Por lo tanto, al momento de los hechos, el reglamento vigente era el Reglamento de Zonificación de Puerto Rico Núm. 6211, supra.

 Sección 4.09 del Reglamento de Zonificación Núm. 6211, supra, págs. 50-51. Véase, además, las Seccciones 7.00 y 10.00 del Reglamento Adjudicativo Núm. 6031, Reglamento de Procedimientos Adjudicativos de la Junta de Planificación de 13 de octubre de 1999, págs. 26-43.

 Misión Ind. P.R. v. J.P., supra, págs. 128-129; Montalvo v. Mun. de Sabana Grande, 138 D.P.R. 483, 488-489 (1995); Luán Investment Corp. v. Román, supra, pág. 547 esc. 2; López v. Junta Planificación, 80 D.P.R. 646, 667-669 (1958).

 Asoc. Vec. Urb. Huyke v. Bco. Santander, 157 D.P.R. 521, 550 (2002); The Richards Group v. Junta de Planificación, 108 D.P.R. 23, 31-32 (1978).

 Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 71 et seq.). Debemos señalar que la Ley Orgánica de la Administración de Reglamentos y Permisos fue derogada por la Ley Núm. 161 de 1 de diciembre de 2009, mejor conocida como Ley para la Reforma del Proceso de Permisos de Puerto Rico, 23 L.P.R.A. sec. 9011 et seq.

 23 L.P.R.A. sec. 71d(p).

 Véase Glosario de Términos de los Reglamentos de Planificación, supra, Sec. 2.0KF-9), pág. 60.

 Ley Núm. 81 de 30 de agosto de 1991 (21 L.P.R.A. sec. 4001 et seq.).

 Véase el Artículo 4 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4003.

 Esta política pública “va dirigida a proporcionar un uso juicioso y aprove-chamiento óptimo del territorio municipal para asegurar el bienestar de las genera-ciones actuales y futuras, promoviendo un proceso de desarrollo ordenado, racional e integral de sus terrenos”. Memorial Explicativo del Reglamento sobre los Planes de Ordenación Municipal y Transferencia y Administración de Facultades (Reglamento de Planificación Núm. 24) de 20 de mayo de 1994, pág. 2. Véanse: Borschow Hosp. v. Jta. de Planificación, supra; J.A. Punsoda Díaz, Planificación urbana y ordenación territorial: peligros y oportunidades de la Ley de Municipios Autónomos, en L. Santana Rabell y M. Negrón Portillo, eds., La reforma municipal en Puerto Rico: retos y oportunidades, San Juan, Escuela Graduada de Administración Pública, U.P.R., 1993, pág. 142.

 Mun. de Ponce v. J.P., 146 D.P.R. 650, 654 (1998). Véase 21 L.P.R.A. sec. 4602.

 Artículo 2.004 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4054(h).

 21 L.P.R.A. sec. 4610.

 El Artículo 13.004 de la Ley de Municipios Autónomos, supra, define al Plan de Ordenación Territorial como la organización de “usos, bienes inmuebles y estruc-turas de un territorio para ordenarlo en forma útil, eficiente y estética, con el pro-pósito [del] desarrollo social y económico, lograr el buen uso de los suelos y mejorar la calidad de vida de sus habitantes presentes y futuros”. 21 L.P.R.A. sec. 4601(n).

 Artículo 13.005 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4603.

 21 L.P.R.A. sec. 4054(s). Véase, además, el Artículo 13.003(s) de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4601.

 Reglamento de Calificación de Suelos del Municipio Autónomo de Guay-nabo, supra, Sec. 2.00, pág. 8.

 Glosario de Términos de los Reglamentos de Planificación, supra, Sec. 2.01(0-7), pág. 24.

 Artículo 13.011 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4609.

 Borschow Hosp. v. Jta. de Planificación, supra, págs. 560-561; Artículo 13.008 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4606. Véase, además, la expresión del Secretario de Justicia, quien nos señala que “[l]a función de planifica-ción y ordenación de los usos del terreno recaía casi exclusivamente en la Junta de Planificación previa [sic] la aprobación de la Ley de Municipios Autónomos, y queda ahora compartida por los municipios, a los cuales se les han conferido las facultades y responsabilidades para llevarlo a cabo, en coordinación con las agencias del Go-bierno Central”. (Énfasis nuestro.) Op. Sec. Just. Núm. 1992-17.

 Artículo 13.011 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4609. Véase Reglamento de Ordenación Núm. 4, el cual dispone que “[s]e aprobarán soli-citudes y se expedirán los permisos o autorizaciones que correspondan con sujeción a las disposiciones de las leyes y reglamentos aplicables y de acuerdo con lo establecido en este reglamento”. (Énfasis nuestro.) Sec. 4.14 del Reglamento para Regir las Dis-posiciones Sustantivas, Procesales y de Procedimientos Adjudicativos de la Oficina de Permisos del Municipio Autónomo de Guaynabo, junio 2000, pág. 30.

 Este es el documento de política pública adoptado por la Junta de Planifi-cación, el cual, “dependiendo de su alcance geográfico y propósito, designará la dis-tribución, localización, extensión e intensidad de los usos del suelo y otros elementos, tales como la infraestructura para propósitos urbanos, rurales, agrícolas ...”. 2Í L.P.R.A. sec. 4601(r).

 21 L.P.R.A. sec. 4610.

 3 L.P.R.A. sec. 2101 et seq.

 D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Bogotá, Ed. Forum, 2001, pág. 517.

 Comisión Ciudadanos v. G.P. Real Property, 173 D.P.R. 998, 1015 (2008); Rivera Concepción v. A.R.Pe., 152 D.P.R. 116, 122 (2000); Misión Ind. P.R. v. J.C.A., 145 D.P.R. 908, 930 (1998); Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 435 (1997).

 Ordenanza Municipal Núm. 78, Serie 1998-99, de 11 de diciembre de 1998.

 Resolución Núm. JP-PT-16-1, de 16 de noviembre de 1999.

 Boletín Administrativo Núm. OE-1999-63, de 15 de diciembre de 1999.

 Ordenanza Municipal Núm. 127, Serie 2000-2001, de 16 de noviembre de 2000.

 La Ley de Municipios Autónomos establece que la Junta y A.R.Pe. se reser-van la facultad de atender los proyectos que conlleven variaciones de uso y variacio-nes de intensidad en construcción o uso, los proyectos privados y públicos de impacto regional, al igual que los proyectos municipales no delegados, que no hayan sido incluidos en el Plan de Ordenación. Art. 13.012 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4610.

 El Programa para la Transferencia de las Jerarquías dispone que a los seis meses de la fecha de vigencia del convenio la Junta de Planificación y A.R.Pe. reali-zarán una evaluación preliminar de la labor del municipio autónomo en el ejercicio de las Jerarquías I, II, III y IV. Posteriormente, al año de esta primera transferencia se realizará una segunda evaluación para determinar si las primeras cuatro jerar-quías fueron debidamente implantadas. De ser ese el caso, la Junta de Planificación y A.R.Pe. le podrán conceder al municipio autónomo, mediante Resolución, la Jerar-quía V. Parte III Sección C(2) del Convenio de Transferencia de Competencias de 28 de noviembre de 2000, págs. 13-14.

 (Énfasis nuestro.) íd., Parte IV, Sección O, pág. 19.

 (Énfasis nuestro.) íd., Parte III, Sección C(2), pág. 13.

 íd., Parte VI, Sec. C(d), pág. 26.

 "El [C]onvenio [de Transferencia de Competencias] podrá establecer limita-ciones en las facultades delegadas, de acuerdo a la capacidad del municipio.” Art. 13.012 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4610.

 Este reglamento está basado en el Reglamento de Zonificación de Puerto Rico Núm. 4844, de 16 de septiembre de 1992 (Reglamento de Planificación Núm. 4) de la Junta de Planificación, el cual sufrió leves modificaciones. Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo de 15 de diciembre de 1999, Vol. I, Cap. V, pág. 128.

 (Énfasis nuestro.) Sec. 2.00 del Reglamento de Calificación de Suelos del Municipio Autónomo de Guaynabo, supra, pág. 11. Además, la Sección 4.05 de este reglamento dispone cuál será el tamaño máximo permitido para que una propiedad pueda ser recalificada directa o indirectamente. En el caso de una propiedad que está calificada como R-3, al igual que C-3, el tamaño límite será de 2,000 metros cuadrados. Esta sección dispone claramente que cualquier solicitud para recalificar un predio que exceda del límite prescrito deberá ser atendida conforme al trámite dispuesto para los desarrollos extensos. Secciones 94.00, 95.00 y 96.00 del Regla-mento de Calificación de Suelos del Municipio Autónomo de Guaynabo, supra.

 (Énfasis nuestro.) Sec. 4.06 del Reglamento de Calificación de Suelos del Municipio Autónomo de Guaynabo, supra, pág. 48.

 El Convenio de 14 de junio de 2005 establece que se transferirán “[o]tras facultades de la Administración de Reglamentos y Permisos y de la Junta de Plani-ficación no incluidas en este Convenio y que se incorporen posteriormente mediante enmiendas al mismo, excepto: ... [c]onsultas de [u]bicación para proyectos industria-les, comprende la ubicación de consultas [sic] para fines industriales específicos, así como la formación de solares para dichos fines”. (Enfasis nuestro.) Parte II(A)(5)(Z)(iii) del Convenio de Transferencia de Competencias del Municipio Autó-nomo de Guaynabo, 14 de junio de 2005, págs. 12-13, Apéndice 4, págs. 191-192. Cabe señalar que del expediente no se desprende prueba alguna sobre la existencia de una enmienda al Convenio de Transferencia de Competencias de 2005 que dele-gue expresamente al Municipio el poder de aprobar una consulta de ubicación.

 Específicamente se transfirieron las solicitudes de autorización de “[d]esarrollo preliminar, Anteproyecto y Permiso para la construcción o uso de pro-yectos privados o municipales de carácter residencial, comerciales, industriales, ins-titucionales, agrícolas, agroindustriales, que constituyan Desarrollos Extensos, siem-pre y cuando sean permitidos ministerialmente, de acuerdo con el Reglamento de Ordenación vigente, o esté conforme con los parámetros de la consulta aprobada por la Junta de Planificación, pero que no implique variaciones de uso y variaciones de intensidad en construcción o uso”. (Enfasis nuestro.) Parte 11(A)(5)(h) del Convenio de Transferencia de Competencias del Municipio Autónomo de Guaynabo, 14 de junio de 2005, pág. 11, Apéndice 4, pág. 190.

 Hatillo Cash & Carry v. A.R.Pe., 173 D.P.R. 934 (2008).

 íd., págs. 955-956.

 Véase, además, la Sección 4.2 de la Ley de Procedimiento Administrativo Uniforme, la cual dispone que la revisión judicial “será el recurso exclusivo para revisar los méritos de una decisión administrativa, sea ésta de naturaleza adjudica-tiva o de naturaleza informal emitida al amparo de este capítulo”. 3 L.P.R.A. sec. 2172.

 Glosario de Términos de los Reglamentos de Planificación, supra, Sec. 2.0KE-16), pág. 52.

 íd., E-17-18, págs. 52-53.

 (Énfasis nuestro.) Misiva del Ledo. Efraín Pérez Jiménez, Vice-Alcalde del Municipio Autónomo de Guaynabo, 12 de noviembre de 2003.

 Véase Convenio de Transferencia de Competencias de 28 de noviembre de 2000, supra, Parte IV, Sec. E(l), pág. 15.

 21 L.P.R.A. sec. 4610.

 “La consulta de ubicación, una vez aprobada por la [Junta de Planificación], también es un elemento esencial en la toma de decisiones de otras agencias. A esos efectos, la consulta es la descripción de un proyecto de desarrollo particular pro-puesto para un área específica, que provee el marco de referencia en el cual las demás agencias deben medir la viabilidad del proyecto para la aprobación de sus respectivos permisos. T-JAC, Inc. v. Caguas Centrum Limited, supra, pág. 85. Por *976 esto, es importante que los permisos posteriores se mantengan en el marco de lo aprobado por la [Junta de Planificación], en función de sus facultades de guiar la política pública en el ordenamiento territorial”. (Escolio omitido.) Hatillo Cash & Carry v. A.R.Pe., supra, pág. 949. En cuanto a las funciones operacionales de A.R.Pe., que son las que el Municipio viene a ejercer en esta etapa, en ese caso expresamos lo siguiente: “las disposiciones de la Consulta de Ubicación que aprueba la Junta de Planificación (JP) establecen los parámetros que ARPe. debe seguir al considerar los permisos siguientes.” Id., pág. 950 esc. 6.

 "No obstante, la situación dentro del sector, con el tiempo cambió y así lo reflejan las consultas de ubicación residenciales aprobadas por la Junta en los sola-res colindantes. Este elemento no presente en el 2003 es un efecto acumulativo y de impacto al sector. También cambiaron las políticas públicas que interesa promover el Municipio Autónomo para con su territorio, al amparo de las facultades delegadas bajo la Ley Núm. 81, supra.fJZ Municipio interesa, al presente, conservar el desarro-llo residencial del sector.” (Énfasis nuestro.) Petición de Certiorari, pág. 15. Es me-nester resaltar que el Municipio no presentó evidencia alguna sobre las alegadas consultas de ubicación residenciales aprobadas en los solares colindantes al del pro-yecto de Unlimited.

 Petición de certiorari, págs. 24-25.

 Véase, además, las condiciones generales del Convenio de Delegación de Competencias, supra, pág. 14, al igual que la Sección 1.07 del Reglamento de Califi-cación del Municipio Autónomo de Guaynabo, supra, pág. 2, el cual enuncia que las disposiciones de dicho cuerpo reglamentario “se complementarán e interpretarán a la luz de las políticas públicas establecidas en el Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo”.

 Plan de Ordenación Territorial del Municipio Autónomo de Guaynabo, Vol. I, supra, pág. 132.

 Punsoda Díaz, op. cit., pág. 142. Existen, además, diversas doctrinas en torno al estudio de la administración pública. Entre ellas, la fórmula político-administrativa resalta la idea que “la tarea del Estado es divisible en dos partes, decisión y ejecución, y que la ejecución (Administración) es o puede llegar a ser una ciencia”. D. Waldo, Teoría política de la administración pública, Madrid, Ed. Tecnos, 1961, pág. 309.

 Punsoda Díaz, op. cit., pág. 144.

 issues concerning the rule of law are important for the study of implementation because implicit in that concept is the notion that citizens should be able to predict the impact of the actions of the state upon their lives and secure redress when affected by illegitimate actions.” M. Hill y P. Hupe, Implementing Public Policy, 2da ed., London, Sage Publications, 2009, pág. 22.

 El profesor Fernández Quiñones nos señala la gran importancia de la polí-tica pública en las esferas administrativas, ya que “[l]a cultura jurídica normativa fundamenta y orienta la construcción de las políticas públicas, a los efectos de que se establezcan los principios, las guías y los estándares generales que los funcionarios gubernamentales habrán de utilizar en el uso de su discreción y en el ejercicio de sus deberes al administrar la política que corresponda”. D. Fernández Quiñones, La Formación de la Política Pública, 3 Rev. Ethos Gubernamental 6 (2005-2006). Véase, además, Hernández, Álvarez v. Centro Unido, supra.

 (Énfasis nuestro.) Artículo 13.003 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4601(bb). Véase, además, la Sección 2.39 del Reglamento sobre los Planes de Ordenación Municipal y la Transferencia y Administración de Facultades de 20 de mayo de 1994 (Reglamento de Planificación Núm. 24), pág. 2-12.

 (Énfasis nuestro.) Punsoda Díaz, op. cit., pág. 144.

 “[¿a] planificación, ha de consistir en una actividad racional, en función de la cual se adoptan y aplican decisiones de variado género. El fundamento de la decisión planificadora ha de descansar en los resultados de una amplia y previa labor informativa, por virtud de la cual la Administración obtenga todos los datos posibles que le permitan valorar los efectos futuros de su decisión, previniendo siem-pre un margen de error.” (Énfasis nuestro.) E. Vázquez Bote, Significado auténtico de la planificación democrática como elemento componente de la administración pública del estado de derecho y el problema de su existencia en Puerto Rico, Separata de la Rev. Der. Pur., Ponce, 1969-1970, pág. 683.

 “Policy formulation refers to the stage of generating options about what to do about a public problem. Once a government has acknowledged the existence of a public problem and the need to do something about it, that is, once it has entered onto the agenda of government, policy-makers are expected to decide on a course of action to follow in addressing it... Policy formulation thus involves identifying both the technical and political constraints on state action.” (Énfasis nuestro.) M. Howlett, Designing Public Policies: Principles and Instruments, Londres, Routledge Ed., 2011, págs. 29-30.

 A su vez, el proceso de decisión y ejecución está enmarcado en un proceso complejo de diseño de política pública. Sobre el mismo, Kruschke y Jackson nos remiten al modelo estándar siguiente: “In general, the policy process involves: (1) *980 perceiving and defining a problem; (2) placing the problem on the government agenda; (3) aggregating interests involved in the problem; (4) maintaining contacts with those involved; (5) formulating alternative solutions; (6) legitimizing a policy; (7) providing the necessary budget for implementing the policy; (8) implementing the policy; (9) evaluating the policy; and (10) deciding either to revise or to terminate the policy in view of its impact on relevant clientele.” E. Kruschke & B. Jackson, The Public Policy Dictionary, Santa Barbara/Oxford, Ed. Abc-Clio, 1987, pág. 29. Véase, además, M. Hill, The Public Policy Process, 5ta ed., Londres, Pearson Longman, 2009, pág. 142.

 Petición de certiorari, pág. 12.

 Hernández, Álvarez v. Centro Unido, supra.

 íd., págs. 628-629.

 Además, según hemos establecido, “una vez se ha adoptado una norma, la agencia administrativa, debe cumplirla y aplicarla en la manera en que está conce-bida, sirviendo siempre a los propósitos, objetivos y política pública que la forjaron”. (Énfasis nuestro.) Centro Unido Detallistas v. J.P., 172 D.P.R. 601, 614 (2007). Véanse: Torres v. Junta Ingenieros, 161 D.P.R. 696 (2004); T-JAC, Inc. v. Caguas Centrum Limited, supra, pág. 81; Montoto v. Lorie, supra, pág. 47; García Cabán v. U.P.R., 120 D.P.R. 167, 175 (1987).

 Debemos resaltar que la alegación del Municipio ignora nuevamente su propio Reglamento de Calificación de Suelos. Citamos, de forma demostrativa, la Sección 94.03 del Reglamento de Calificación, supra, pág. 226, el cual expone que el uso e intensidad propuesta para un proyecto de desarrollo extenso debe estar con-forme con “el Plan de Usos de Terrenos hasta donde éste haya sido adoptado y el Plan de Ordenación Territorial”. (Énfasis nuestro.)

 (Énfasis nuestro.) Art. 13.005 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4603.

 El Artículo 13.008 de la Ley de Municipios Autónomos, supra, dispone que “\p]ara entrar en vigencia, los Planes de Ordenación requerirán su aprobación por la Legislatura Municipal, su adopción por la Junta de Planificación y su aprobación por el Gobernador”. (Énfasis nuestro.) 21 L.P.R.A. sec. 4606. Véase, además, la Sec-ción 16.03 del Reglamento sobre los Planes de Ordenación Municipal y la Transfe-rencia y Administración de Facultades 5087, (Reglamento de Planificación Núm. 24) de 20 de mayo de 1994. Con ello, esta disposición reconoce que la etapa de la adop-ción, en el transcurso de la elaboración de una política pública, no constituye el fin del proceso (“[Policy adoption is an] early stage of the public policy process in which policy decision-makers review and settle on one or a set of alternatives to solve a problema ...”). (Énfasis nuestro.) Kruschke y Jackson, op. cit, pág. 59.

 Maldonado v. Junta de Planificación, 171 D.P.R. 46 (2007).

 íd., pág. 66.

 íd., págs. 66-67.

 Glosario de Términos de los Reglamentos de Planificación, supra, Sec. 2.01(A-77), pág. 12. A su vez, el Reglamento de Ordenación Núm. 4 del Municipio nos ilustra en torno a la frase “reglamentos aplicables”. Este reglamento define dicha expresión como “[t]odos aquellos reglamentos promulgados y adoptados o aprobados por los distintos organismos gubernamentales incluyendo los del Municipio, publica-dos de acuerdo con la ley y que sean aplicables al caso específico”. Sec. 1.10 del Reglamento de Ordenación Núm. 4, supra, pág. 5. Véase, además, Glosario de Tér-minos de los Reglamentos de Planificación, supra, R-22, pág. 110.

 yéase Boletín Administrativo Núm. OE-2010-16 de 2 de mayo de 2010.

 “As a general rule, a newly enacted zoning ordinance will apply retroactively to block a building permit applied but not granted before the effective date of the new ordinance.” Yokley, supra, Vol. 2, Sec. 14-7, págs. 14-29.

 “¶ a iocai government is guilty of misconduct or bad faith in dealing with a permit applicant, or adopts a rezoning specifically to thwart an applicant’s proposed use of land, thereby discriminating against the applicant, the general rule of retroactive application does not apply.” (Énfasis nuestro.) Id., págs. 14-32.

 Véanse: Figgie Inti. v. Town of Huntington, 203 A.D.2d 416 (1994); Matter of Hatcher v. Planning Bd. of Vil. of Nelsonville, 111 A.D.2d 812 (1985); Matter of Pokoik v. Silsdorf, 40 N.Y.2d 769 (Í976); Golisano v. Town Bd. of Town of Macedón, 31 A.2d 85 (1968); Commercial Properties, Inc. v. Peternel, 418 Pa. 304, 2Íl A.2d 514 (1965).
En Downey Farms Dev. Corp. v. Town of Cornwall Planning Bd., 858 N.Y.S. 2d 542 (2008), la parte proponente presentó una solicitud de segregación (“subdivisión”) mientras el municipio estudiaba la revisión de su Plan de Ordenación Territorial (“Comprehensive Plan”), el cual recomendaba un aumento en el tamaño mínimo de ocupación de área del distrito por desarrollarse. Inexplicablemente, el municipio re-quirió varios estudios innecesarios y se demoró excesivamente, por más de medio año, en referir el asunto a otros entes gubernamentales para su estudio. Al final, no se pudo superar la fase preliminar, a pesar de varias diligencias e iniciativas por parte de la proponente, y la nueva reglamentación entró en vigor, impidiendo así que se completara el proceso de evaluación al amparo de la reglamentación anterior. El Tribunal Supremo de Nueva York resolvió que cuando la demora indebida en el proceso peijudica a la parte proponente es menester determinar si en las circunstan-cias más favorables (“best case scenario”) la parte proponente hubiese podido obtener la autorización antes de que entrara en vigor la nueva reglamentación. Luego, hace falta precisar si hubo actos innecesariamente dilatorios o negligentes constituyentes de mala fe por parte del ente municipal y si éstos fueron, en efecto, el nexo causal o la razón por la cual la parte proponente no tuvo una oportunidad justa para obtener la autorización antes de entrar en vigor la nueva reglamentación.
Vale resaltar que en Matter of Pokoik v. Silsdorf, supra, también medió una orden de mandamus por parte del foro judicial para obligar al ente local a resolver la *985 solicitud presentada por la parte proponente. “This administrative procrastination, calculated to deny a property owner his right to use this land in a currently lawful manner, is supportable neither by law nor by sound and ethical practice.” Id., pág. 772, citando 1 Anderson, NY Zoning Law & Practice Sec. 6.17, pág. 196.

 El Convenio de Transferencia de Competencias sobre la Ordenación Territorial del Municipio Autónomo de Guaynabo de 14 de junio de 2005 incluye en su Parte IV que “[e\n el proceso de evaluación y toma de decisiones sobre las facultades transferidas, el Municipio aplicará y velará por el cumplimiento de sus propios re-glamentos ...” (Enfasis nuestro.) Convenio de Transferencia de Competencias, supra, pág. 23. A su vez, la Sección 4.24 del Reglamento de Ordenación Núm. 4, el cual fue aprobado por el propio Municipio, dispone que una solicitud de anteproyecto, cuya área de construcción exceda los 50,000 pies cuadrados, se tramitará y se resolverá en un plazo no mayor de 90 días. Sec. 4.24(l)(a) del Reglamento para Regir las Dispo-siciones Sustantivas, Procesales y de Procedimientos Adjudicativos de la Oficina de Permisos del Municipio Autónomo de Guaynabo, supra, pág. 33. Resaltamos que aunque los términos provistos en este reglamento son términos directivos, no es menos cierto que hay una gran diferencia entre 90 días y un año y medio, máxime con las diligencias realizadas por Unlimited para que se atendiera su solicitud con prontitud.

 El Municipio pudo haber decretado una moratoria en la consideración de permisos mientras llevaba a cabo la revisión de la política pública en torno a sus suelos, facultad que puede ejercer, por disposición estatutaria y reglamentaria, cuando lo estime necesario. Concretamente, la moratoria cumple con el propósito de facilitar la elaboración o revisión de un Plan de Ordenación mediante la suspensión total o parcial de la concesión de nuevas autorizaciones y permisos por la Junta o el Municipio. Sec. 17.00 del Reglamento sobre los Planes de Ordenación Municipal y la Transferencia y Administración de Facultades (Reglamento de Planificación Núm. 24), supra, pág. 17 — 1. A su vez, la Sección 17.01 dispone que “[l]os municipios sólo *986 podrán decretar la moratoria para aquellas autorizaciones o permisos comprendidos dentro de las jerarquías de facultades de ordenación territorial que le hayan sido transferidas y para revisar un Plan de Ordenación o un Reglamento de Ordenación”, íd. Véase, además, Art. 13.009 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4607. Nuestra jurisprudencia demuestra el uso responsable de la moratoria tanto para que no se afectara el proceso de elaboración o revisión de un Plan de Ordena-ción como para no causar perjuicios a la parte proponente que solicita una autoriza-ción o un permiso. En Borschow Hosp. v. Jta. de Planificación, supra, el Municipio Autónomo de San Juan se sirvió de este mecanismo para suspender la concesión de nuevas autorizaciones o permisos en una zona particular de su demarcación territorial, debido a que se encontraba elaborando su Plan de Ordenación Territorial. Ade-más, en ese caso el municipio autónomo endosó la' consulta de ubicación presentada ante la Junta pero condicionada a las disposiciones del futuro Plan de Ordenación Territorial.

 (Énfasis nuestro.) Mun. de San Juan v. J.C.A., 152 D.P.R. 673, 712 (2000).

 La denegación del ente municipal fue parca y carente de un estudio serio de las determinaciones de la Junta en cuanto a la viabilidad del negocio de mini-almacenes, cuya naturaleza es más propia a un uso comercial que industrial, al amparo de las disposiciones correspondientes a un Distrito mixto R-3 y C-3. Resal-tamos que la Sección 16.02 del Reglamento de Calificación de Suelos del Municipio Autónomo de Guaynabo, supra, permite ciertos usos ligados al almacenaje en distri-tos C-3. El inciso (6) de esta sección permite que un predio calificado como C-3 se destine al “[almacenaje y venta de muebles y artículos domésticos”. (Énfasis nuestro.) See. 16.02(6) del Reglamento de Calificación de los Suelos, supra, pág. 93. Igualmente, la Sección 16.02(19) de este reglamento permite el uso destinado a un “[c]omercio o almacenaje de películas y estudios cinematográficos”. (Énfasis nuestro.) íd. Además, la Sección 16.02(65)(j) permite en este distrito usos industriales siempre y cuando no produzcan condiciones, tales como polvo, humo, fuego, etc., que puedan afectar áreas adyacentes. En particular, este inciso expresa que se permitirá “[¿[ualquier otra actividad industrial a tono con el sector donde ha de ser establecida cuando se demuestre que por medio del diseño o de la instalación propuesta se protege *987 la salud, seguridad, y bienestar general de los posibles ocupantes del edificio y de los residentes de las propiedades limítrofes y no se menoscabe el suministro de luz y aire a la edificación a ocuparse o a las propiedades vecinas, o se aumente el peligro de fuego, o se ocasione reducción o perjuicio a los valores de las propiedades estableci-das en el sector”. (Enfasis nuestro.) Id., pág. 96. El proyecto propuesto por Unlimited es de naturaleza comercial pero con diseño industrial, requiere poca mano de obra y no tiene indicios de poner en riesgo la seguridad de los colindantes como lo haría un proyecto netamente industrial.

 Respecto a su postura en torno a los efectos del cambio en su política pública, el Municipio señaló que la incongruencia entre su endoso en el proceso de la consulta y la denegación posterior se debió al transcurso de cuatro años entre la aprobación de la enmienda a la consulta de ubicación y la presentación de la autori-zación de anteproyecto. “Mediante resolución de 1 de mayo de 2007, el anteproyecto fue denegado. Nótese, unos cuatro (4) años después de la aprobación de la consulta [Unlimited] presenta un anteproyecto en la Oficina de Permisos del Municipio de Guaynabo, acompañado por la resolución de la Junta [de Planificación].” (Enfasis nuestro.) Petición de certiorari, pág. 12. Esta misma aseveración incorrecta fue ale-gada ante el Tribunal de Apelaciones. Véase Oposición a Revisión Judicial de 17 de julio de 2007. Apéndice 9, págs. 286-287.

 “Todo municipio que decida revisar integralmente un Plan de Ordenación deberá notificarlo por correo certificado con acuse de recibo a la Junta, antes de comenzar sus trabajos.” (Enfasis nuestro.) Sec. 16.01 del Reglamento de Planificación Núm. 24, supra, pág. 16-1. Véase, además, Art. 13.008 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4606.

 El Municipio ni siquiera presentó un Avance del Plan, el cual “resume e ilustra las decisiones o recomendaciones preliminares más importantes de un Plan de Ordenación en desarrollo”. (Énfasis nuestro.) Sec. 2.00(2) del Reglamento de Plani-ficación Núm. 24, supra, pág. 2-1.

 Sobre los inicios de la relación ministerial entre la Junta y los municipios, en la planificación de sus suelos, el entonces Presidente de la Junta de Planificación, el doctor Rafael Picó, ilustra que “[l]a Junta está facultada por ley para crear y nombrar, para cualquier municipio, a petición del alcalde, una Comisión Local de Planificación. Esta Comisión podrá asesorar a la Junta, cuando sea consultada por ésta, o a iniciativa propia, respecto a cualesquiera problemas de planificación local en su municipio, principalmente en lo que concierne a obras públicas y ala zonificación. Al lograr estos objetivos, consideraremos entonces que la planificación ha penetrado en el corazón de Puerto Rico y sus habitantes”. (Énfasis nuestro.) R. Picó, 10 años de Planificación en Puerto Rico, Junta de Planificación, San Juan, 1952, pág. 15. Véase, además, Memorial Explicativo del Reglamento sobre los Planes de Ordenación Municipal y Transferencia y Administración de Facultades, (Reglamento de Planifica-ción Núm. 24), supra, pág. 1.

 "Los poderes y facultades conferidos a los municipios ...se interpretarán liberalmente, [en armonía con la buena práctica de política pública fiscal y administrativa,] de forma tal que siempre se propicie el desarrollo e implantación de la política pública enunciada ...de garantizar a los municipios las facultades nece-sarias en el orden jurídico, fiscal y administrativo para atender eficazmente las ne-cesidades y el bienestar de sus habitantes.” (Énfasis nuestro.) Cía. Turismo de P.R. v. Mun. de Vieques, 179 D.P.R. 578, 584-585 (2010), citando 21 L.P.R.A. sec. 4002.

 Mun. San Juan v. Plaza Las Américas, 169 D.P.R. 310, 321 (2006); Metropolitan S.E. v. A.R.Pe., 138 D.P.R. 200, 207 (1995). Debemos resaltar que en el ejer-cicio de éstas y otras facultades delegadas, A.R.Pe. debe actuar conforme a la auto-rización y condiciones consignadas mediante resolución de la Junta, en sus reglamentos o la propia Ley Núm. 75. Véase el Artículo 5 de la Ley Orgánica de A.R.Pe., 23 L.P.R.A. sec. 71d y 23 L.P.R.A. secs. 62 a 63j.

 Convenio de Transferencia, firmado tanto por la Junta como por el Mu-nicipio, establece los principios de coordinación y fiscalización que procura “[a] los fines de lograr una coordinación efectiva la Junta de Planificación, la [A.R.Pe.] y el Municipio deberán, en sus relaciones recíprocas ... [r]espetar el ejercicio legítimo ... de las funciones y responsabilidades de su competencia o jurisdicción y las consecuen-cias que de éstas se deriven". (Énfasis nuestro.) Convenio de Transferencia de Com-petencias de 14 de junio de 2005, supra, Parte V(A)(1), pág. 26, Apéndice 4, pág. 205.

 La norma general es que las decisiones de los organismos administrativos deben ser consideradas con gran deferencia por los tribunales apelativos, en razón de la experiencia y pericia de las agencias respecto a las facultades que se les han delegado. Estas decisiones administrativas deben ser respetadas a menos que la parte recurrente establezca que hay evidencia en el expediente administrativo suficiente para demostrar que la agencia no actuó razonablemente. Véanse: Mun. de San Juan v. CRIM, 178 D.P.R. 163, 175 (2010); Borschow Hosp. v. Jta. de Planificación, supra; Hatillo Cash & Cany v. A.R.Pe., supra; Otero v. Toyota, 163 D.P.R. 716 (2005); Rivera Concepción v. A.R.Pe., 152 D.P.R. 116 (2000); Misión Ind. PR. v. J.P., supra. Conforme a esta línea argumentativa, el profesor Fernández Quiñones expresa que “[s] ólo cuando las agencias administrativas estén diseñando cuestiones de hecho o de política pública altamente técnica es que se determina que las agencias se encuentran mejor equipadas para hacer la decisión que interpreta la ley. Empero, el hecho de la especia-lización o el manejo de cuestiones técnicas no es una carta en blanco para que se actúe en forma caprichosa, arbitraria e irrazonable”. (Énfasis nuestro.) Asoc. Fcias. v. Caribe Specialty et al. II, 179 D.P.R. 923, 941 esc. 44 (2010), citando a D. Fernández Quiñones, Derecho administrativo y Ley de Procedimiento Administrativo Uniforme, op. cit., pág. 560.

 Pfizer Pharm. v. Mun. de Vega Baja, 182 D.P.R. 267 (2011).

 Afk 13.012 de la Ley Núm. 81 (21 L.P.R.A. sec. 4610). Véase, además, el Convenio de Transferencia de Competencias de 14 de junio de 2005, supra, pág. 33, y la Sección 18.02 del Reglamento de Planificación Núm. 24, supra, págs. 18-9 y 18-10.

 Sentencia del Tribunal de Apelaciones de 30 de agosto de 2007, pág. 12.

 Facultad que se retiene mientras no se delegue expresamente a un muni-cipio autónomo, mediante la Jerarquía V, la facultad de aprobar una consulta de ubicación que constituya una recalificación indirecta.